UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ORANGEBURG MILLING COMPANY, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PREMIER CHEMICALS, LLC; SUMITOMO CORPORATION OF AMERICA; and YAS, INC.,<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE CASE

1. Plaintiff brings this lawsuit as a class action on behalf of all individuals and entities that purchased caustic-calcined magnesium oxide and/or dead-burned magnesium oxide (collectively "MgO") in the U.S. from defendants, their predecessors, subsidiaries, or co-conspirators from at least February 1, 2004 through the present (the "Class Period"). Plaintiff alleges that during the Class Period, defendants conspired to fix, raise, maintain, or stabilize prices for MgO sold in the U.S. As a result of defendants' unlawful conduct, plaintiff and the class members paid more for MgO than they would have absent defendants' illegal conduct.

## JURISDICTION AND VENUE

2. Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover damages and costs of suit, including reasonable attorneys' fees, as the result of defendants' violation of §1 of the Sherman Act (15 U.S.C. §1).

3. Subject-matter jurisdiction is proper pursuant to 28 U.S.C. §1337 and by §§4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26).

4. Venue is proper in this district pursuant 28 U.S.C. §1391(b) and (c) and by §12 of the Clayton Act (15 U.S.C. §22).

5. Defendant Premier Chemicals, LLC is incorporated in this district; all defendants transact business in this district; and Plaintiff's claims arose, in part, within this district. The interstate trade and commerce described herein was carried out, in part, within this district, and unlawful acts done in violation of the Sherman Act occurred within this district.

## PARTIES

6. Plaintiff Orangeburg Milling Company, Inc. is a South Carolina company that purchased MgO directly from one or more of the defendants during the Class Period.

7. Defendant Premier Chemicals, LLC is a Delaware corporation with its principal place of business in Conshohocken, Pennsylvania. During the Class Period, Premier mined, manufactured, distributed, and sold MgO in the U.S.

8. Defendant Sumitomo Corporation of America is a New York corporation with its principal place of business in New York, New York. During the Class Period, Sumitomo distributed and sold MgO in the U.S.

9. Defendant YAS, Inc. maintains its principal place of business in Franklin Lakes, New Jersey. During the Class Period, YAS facilitated Sumitomo's sourcing of MgO from China for distribution and sale in the U.S.

## CO-CONSPIRATORS

10. Various other persons, firms or corporations not yet named as defendants in this lawsuit participated as co-conspirators with defendants in the offenses alleged and performed acts and made statements to advance these offenses.

## CLASS-ACTION ALLEGATIONS

11. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All people and entities that purchased MgO in the U.S. directly from one or more of the defendants from at least February 1, 2004 to present.
>
> Excluded from the class are the defendants, their parent companies, subsidiaries, or affiliates.

12. Plaintiff does not know the exact size of the class since this information is in the defendants' exclusive control. Based on the nature of the trade and commerce involved, however, plaintiff believes the class numbers at least in the thousands and that the members of the class are geographically dispersed throughout the U.S. Therefore, joinder of all class members would be impracticable.

13. Common questions of law or fact predominate among the class members, including but not limited to:

   a. whether defendants conspired to fix, raise, maintain, or stabilize the prices of MgO sold in the U.S.;

   b. whether defendants conspired to allocate markets for MgO sold in the U.S.;

   c. whether defendants' conduct caused injury to plaintiff's and the class members' business or property and, if so, the appropriate classwide measure of damages; and

   d. whether defendants took steps actively to conceal their conspiracy.

14. These and other questions of law or fact predominate over any questions affecting only individual class members.

15. Plaintiff Orangeburg's claims are typical of the class members' claims in that it is a direct purchaser of MgO from one or more of the defendants; its purchases during the Class Period were typical of purchases by other class members; and the relief Orangeburg seeks—monetary damages and injunctive relief—are common to the class. In other words, the alleged conspiracy affected Plaintiff Orangeburg the same as it affected each of the class members.

16. Plaintiff will fairly and adequately protect the class members' interests in that plaintiff is a typical purchaser of MgO; has no conflict with any other members of the class; and is represented by experienced and able antitrust class-action counsel. Plaintiff's interests are also coincident with, and not antagonistic to, the class members' interests.

17. Class action treatment is superior to any alternative for the fair and efficient adjudication of this case because class treatment allows a large number of injured parties to simultaneously and efficiently prosecute their common claims in a single forum without duplicating evidence and effort. Class treatment also permits the adjudication of claims by smaller class members who could not afford to litigate individually an antitrust claim against large corporate defendants.

18. Class certification is appropriate under Rule 23(b)(2) because defendants have acted on grounds generally applicable to the respective class members, thereby making appropriate final injunctive relief with respect to class members as a whole.

## TRADE AND COMMERCE

19. Defendants mine, manufacture, distribute, and/or sell MgO either independently, as a subsidiary, or as part of a joint venture. MgO manufactured, distributed, and/or sold by one defendant is fungible, as it is comparable to and interchangeable with MgO manufactured, distributed, and/or sold by the other defendants.

20.     During the Class Period, defendants sold MgO in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which defendants mined or otherwise originally acquired MgO. Thus, defendants' business activities with respect to MgO were within the flow of, and substantially affected by, interstate trade and commerce.

## FACTS

### *MgO*

21.     MgO is a solid, white, naturally occurring mineral. It is formed by an ionic bond between one magnesium atom and one oxygen atom.

22.     MgO is used in a wide variety of industrial applications, including the production of refractory products, animal feeds, fertilizers, pharmaceuticals, food products, electrical insulation, and flame-retardant materials, among other things.

23.     MgO can be mined from magnesite, or it can be processed from seawater or subterranean brines containing magnesium chloride. The two most common forms of MgO are caustic-calcined magnesia and dead-burned magnesia. Caustic-calcined magnesia (Caustic MgO) is manufactured at lower temperatures than dead-burned magnesia and is used in products such as animal feeds and fertilizers that do not require the reduced reactivity offered by dead-burned magnesia. Dead-burned magnesia is most often used in refractory applications.

24.     The MgO industry has a number of structural and other characteristics that facilitate the implementation and maintenance of a horizontal price-fixing conspiracy, and demonstrate that all MgO purchasers were impacted by the conspiracy. These characteristics include:

    a.    MgO is a commodity product that is fungible in the sense that MgO manufactured by any defendant is readily substitutable with the MgO manufactured by any other defendant. MgO is a highly homogenous product sold by defendants and purchased by Plaintiff and members of the class primarily on the basis of price. It is easier to form and sustain a cartel when the product in question is a commodity because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

    b.    Defendants sold or had the ability to sell MgO of comparable type and quality throughout the U.S. in overlapping geographic markets.

    c.    The MgO industry in the U.S. is highly concentrated, facilitating coordination of MgO prices among defendants. During the class period, defendants had market power over the sale of MgO in the U.S.

    d.    There are substantial barriers to entry in the MgO industry. Entry into the industry requires a substantial sunk investment and a significant period of time. The minimum viable scale of a new MgO production facility is very large and extremely costly. Similarly, viable entry requires that the new producer capture a significant market share from existing producers. Thus, entry is both expensive and risky.

    e.    The demand for MgO was inelastic.

### *The MgO Market*

25.    In 2000, Premier controlled the majority of domestically consumed Caustic and Dead-Burned MgO. In 2000, domestic production contributed to approximately 50% of the total U.S. consumption of Caustic and a lesser amount of Dead-Burned MgO with the rest coming mostly from China, which Premier purchased for resale to its U.S. customers. Sumitomo similarly purchased Chinese MgO but only Dead-Burned MgO for resale to its U.S. customers. Premier and Sumitomo also sourced magnesite from China for manufacture into Dead-Burned MgO for sale in the U.S. YAS facilitated Sumitomo's purchases of Chinese magnesite due to YAS's relationships with the Chinese magnesite mines.

26.    Preceding the Class Period, Premier saw its share of the MgO markets shrink due to increased Chinese competition.

27.     For instance, in the 1980s the U.S. was a net exporter with respect to Dead-Burned MgO. Since then, however, cheaper imports, mainly from China, have replaced some of the U.S. domestic production, notably affecting Premier. During the Class Period Premier and Sumitomo bought virtually all the Chinese Dead-Burned MgO available for purchase and resold it to their U.S. customers.

28.     During the class period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth.

### *The MgO Price-Fixing Conspiracy*

29.     Instead of competing, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating U.S. MgO markets.

30.     The MgO conspiracy began as early as February 2004. Sumitomo, facilitated by YAS, imports MgO from China into the U.S. YAS, through Hideo Sumikawa (formerly of Sumitomo, now YAS president), has relationships with various Chinese magnesite mines. YAS's relationships with these Chinese mines allow Sumitomo to make MgO purchases from these mines for resale in the U.S.

31.     In particular, Sumitomo, through Coy Akiyama—head of Sumitomo's inorganic chemicals unit—purchases MgO from Chinese mines that Sumikawa (YAS) has facilitated, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market.

32.     Premier is also active in the U.S. MgO market. Premier's former president, Cary W. Ahl, Sr., regularly called Sumikawa (YAS) to discuss fixing Premier's and Sumitomo's Dead-Burned MgO prices and allocating their respective MgO accounts in the U.S. While Ahl manipulated MgO prices and markets for Premier, Terry Wakisama implements this price-fixing

and market-allocation scheme for Sumitomo. Ahl's successors at Premier have continued the conspiracy.

33. As an example of defendants' MgO price-fixing and market-allocation schemes, in May 2006 Akiyama (Sumitomo) and Sumikawa (YAS) met at a Tulsa, Oklahoma Holiday Inn for the purpose of discussing how Sumitomo could quietly enter the Caustic MgO market without upsetting Ahl, with whose company–Premier–Sumitomo and YAS were already fixing Dead-Burned MgO prices and allocating Dead-Burned MgO markets.

34. Sumitomo was frustrated that it had been shipping price-fixed Dead-Burned MgO on partially empty barges and wanted to maximize efficiencies by filling these barges with Caustic MgO for sale to the western U.S. But to avoid Ahl's detection, Akiyama (Sumitomo) and Sumikawa (YAS) wanted to enter the Caustic MgO market discreetly for if Ahl were to discover that Sumitomo was competing with Premier's Caustic MgO monopoly, Ahl would likely retaliate against Sumitomo in some fashion.

35. In the course of discussing a strategy for Sumitomo to enter the U.S. Caustic MgO market, Akiyama (Sumitomo) recounted to Sumikawa (YAS) multiple discussions between Akiyama and Ahl where Ahl had called Akiyama to set Dead-Burned MgO prices and to allocate Dead-Burned MgO markets and to ensure that Sumitomo was maintaining its agreement with Premier to fix Dead-Burned MgO prices and to allocate Dead-Burned MgO markets.

36. Sumitomo never ended up entering the Caustic MgO market because shortly after this meeting Ahl discovered what Akiyama (Sumitomo) and Sumikawa (YAS) were planning and dropped (yet later restored) Dead-Burned MgO prices to signal to Sumitomo that Premier not only still controlled the U.S. Dead-Burned MgO market but would exert this same control over the Caustic MgO market were Sumitomo ever to enter it.

37. As a result of Premier's pre-market-entry retaliation, Sumitomo agreed to remain out of the Caustic MgO market—a market Sumitomo, as a rational profit-seeking entity, was motivated to enter—thus allowing Premier to maintain its control over Caustic MgO pricing.

## LEGAL CLAIM
### Violation of the Sherman Act, 15 U.S.C. §1

38. Beginning as early as February 2004 and continuing through the present, defendants and their co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the prices of MgO sold in the U.S. This combination and conspiracy, which consisted of a continuing agreement, understanding, and concert of action to raise, fix, and maintain the prices for the sale of MgO throughout the U.S. and elsewhere, was an unreasonable restraint of trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

39. To form and implement their combination and conspiracy, defendants and their co-conspirators—in particular, Ahl, Akiyama (Sumitomo), and Sumikawa (YAS), as described above via the Tulsa meeting, among other meetings—combined and conspired to do the following things, among others:

   a. exchanged information on prices charged for MgO sold domestically;

   b. agreed to raise, fix, and maintain prices for MgO sold domestically;

   c. raised, fixed, and maintained prices for MgO sold domestically;

   d. allocated markets for MgO, and

   e. sold MgO throughout the U.S. at non-competitive prices.

40. Defendants and their co-conspirators engaged in the foregoing activities in furtherance of their conspiracy and for the purpose of effectuating their unlawful contract,

combination, and conspiracy. Defendants and their co-conspirators are jointly and severally liable for all damages caused by their conspiracy.

41.     As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the class members were injured by having paid more for MgO than they otherwise would have paid absent defendants' unlawful conduct.

## FRAUDULENT CONCEALMENT

42.     Defendants engaged in a successful, illegal price-fixing conspiracy which, by its very nature, was inherently self-concealing.

43.     As a result, until recently neither Plaintiff nor the class members had knowledge of any of the foregoing violations, and neither Plaintiff nor the class members, until recently, could have discovered through reasonable diligence that defendants and their co-conspirators had engaged in the foregoing violations, since defendants and their co-conspirators actively and fraudulently concealed these violations to obscure their illegal activity.

44.     For example, as set forth above, defendants met secretly and amongst themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO.

45.     During the class period, price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs. Defendants used these rationales to explain price increases instead of disclosing that such increases were the intended result of a conspiracy to fix prices and allocate markets.

46.     Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to and did preclude detection.

47.     Defendants and their co-conspirators' fraudulent concealment tolled the statute of limitations applicable to Plaintiff and the class members' claims.

## EFFECTS/DAMAGES

48. Throughout the class period, Plaintiff and the class members purchased MgO from one or more of the defendants, their subsidiaries, affiliates, and/or co-conspirators.

49. Defendants' contract, combination, and conspiracy had the following effects, among others:

    a. defendants and their co-conspirators maintained MgO prices charged to Plaintiff and the class members at artificially high and non-competitive levels;

    b. Plaintiff and the class members were deprived of free and open competition in the purchase of MgO; and

    c. competition in the sale of MgO was unreasonably restrained.

50. As a direct and proximate result of defendants' and their co-conspirators' illegal contract, combination, and conspiracy, Plaintiff and the class members were injured and financially damaged in their businesses and property by having paid more for MgO than they would have absent defendants' and their co-conspirators' unlawful activities. The total amount of damages is presently undetermined.

## JURY DEMAND

50. Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

    a. That the Court certify this action as a class action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure;

    b. That the Court declare defendants' contract, combination, and conspiracy to have violated §1 of the Sherman Act, which violation injured Plaintiff and the class members in their businesses and property;

c.  That the Court enter judgment for Plaintiff and their class members against defendants for treble damages, costs, and reasonable attorneys' fees;

d.  That the Court permanently enjoin defendants from continuing the illegal conduct alleged; and

e.  That the Court grant Plaintiff and the class members all other relief it may deem just and proper.

Dated: September 1, 2010                              Respectfully submitted,

_____
Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA  19428
Telephone:   (484) 342-0700
Facsimile:    (484) 342-0701
Email:          penny@gsk-law.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH  44113
Telephone:   (216) 622-1851
Facsimile:    (216) 241-8175
Email:          karon@gsk-law.com

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN  55403
Telephone:   (612) 338-4605
Facsimile:    (612) 338-4692
Email:          vesades@heinsmills.com

Jason S. Hartley
**STUEVE SIEGEL HANSON LLP**
550 West C Street, Suite 610
San Diego, CA 92101
Telephone: (619) 400-5825
Facsimile: (619) 400-5832
E-mail: hartley@stuevesiegel.com

Douglas A. Millen
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
Email: dmillen@fklmlaw.com

Eugene A. Spector
Jay S. Cohen
William G. Caldes
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
Email: espector@srkw-law.com
jcohen@srkw-law.com
bcaldes@srkw-law.com

Edmund W. Searby
**McDONALD HOPKINS, LLC**
600 Superior Avenue, East
Suite 2100
Cleveland, OH 44141
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: esearby@mcdonaldhopkins.com

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
Email: m.reinhardt@rwblawfirm.com
g.blanchfield@rwblawfirm.com

John G. Felder, Jr.
**McGOWAN HOOD & FELDER, LLC**
1405 Calhoun Street
Columbia, SC 29201
Telephone: (803) 779-0100
Facsimile: (803) 787-0750
E-Mail: jfelder@mcgowanhood.com

*Attorneys for Plaintiff and the class*